UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL MARCEL CARTER,

        Plaintiff,

v.

DANIEL HEYNS, *et al.*,

        Defendants.

_____/

Case No. 1:14-cv-923

Hon. Gordon J. Quist

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner, Joel Carter, at a Michigan Department of Corrections (MDOC) facility. This matter is now before the Court on a motion for summary judgment filed by defendants Vette, Moran, McKee, Stoddard, Buchin and Norwood (docket no. 72), plaintiff's second motion to stay the summary judgment motion (entitled "motion to stay proceedings due to extraordinary circumstances") (docket no. 76), and plaintiff's third motion to stay the summary judgment motion (entitled "request for expedited consideration of plaintiff's motion to stay summary judgment") (docket no. 86).

        **I.**         **Plaintiff's complaint**

Plaintiff is presently is incarcerated at the MDOC's Marquette Branch Prison (MBP). However, the actions about which he complains occurred while he was housed at the Ionia Correctional Facility (ICF) and the Bellamy Creek Correctional Facility (IBC). Plaintiff's complaint named the following MDOC employees as defendants: Director Daniel Heyns; Director of Mental Health David Dawdy; Mental Health Rights Specialist (Specialist) Bill Vette; IBC Warden Kenneth McKee; ICF Warden Cathleen Stoddard; ICF Mental Health Unit Chief (Unit Chief) Michael Moran;

ICF Resident Unit Manager (RUM) Harold Gilkey; ICF Deputy Warden Nanette Norwood; and ICF Counselor J. Buchin.

Plaintiff suffers from multiple sclerosis (MS), a condition that results in multiple and varied neurologic symptoms. As a result of his MS, plaintiff has developed a variety of mental impairments, including a psychosis disorder, an obsessive-compulsive disorder (OCD), and an unspecified other mental disorder arising out of a medical condition. His documented symptoms include paranoia, hallucinations, mania, delusions and depression. Plaintiff alleged that the MDOC has failed to provide treatment for his mental disorders and continuously impose penalties in the form of loss of privileges (LOP). Plaintiff alleged that the conditions of his cell restriction amount to segregation because he receives no environmental stimulation, no access to sunlight and fresh air, and no exercise or space to move freely. Plaintiff contends that he is being punished for his compulsive disorder, and the sanctions are worsening his MS and his psychological conditions. Plaintiff contends that the MDOC has a custom or practice of punishing mentally ill prisoners for symptoms of their mental illnesses, despite the prohibition on such punishment set forth in MDOC Policy Directive 03.03.105 ¶¶ DDD - JJJ.

In July of 2013, MDOC Director of Mental Health Services Dr. Kathleen Mutschler recommended that Warden Stoddard and Unit Chief Moran waive plaintiff's LOP sanctions because of his mental health issues. Both refused to do so. On July 29, 2013, plaintiff spoke to Counselor Buchin, who informed him that he would be printing off a memo waiving plaintiff's sanctions. However, Buchin never provided a copy.

Between June 17, 2013 and August 27, 2013, for a period of 71 days, plaintiff continuously was kept in his cell without exercise, in violation of MDOC Policy Directive 03.03.105

¶ QQQ which requires a "seven day break" after 70 days. On August 23, 2013, during a grievance interview with RUM Gilkey, plaintiff complained that he had not received a break from sanctions for more than two months. RUM Gilkey and Deputy Warden Norwood both upheld Counselor Buchin's denial of a seven-day-break. At the grievance interview, RUM Gilkey also told plaintiff that Warden Stoddard was aware of Dr. Mutschler's recommendation, but that the officers did not like it.

On August 29, 2013, plaintiff spoke with Unit Chief Moran during another grievance interview. Moran denied that Dr. Mutschler had recommended that plaintiff's sanctions be removed, despite the fact that Moran had sent a memorandum to ICF's hearing office in July 2013, informing them of the recommendation. Plaintiff alleges that Warden Stoddard, Deputy Warden Norwood, Unit Chief Moran, RUM Gilkey and Counselor Buchin interfered with Dr. Mutschler's medical treatment recommendation.

Plaintiff transferred to IBC in September 2013. At the time of his transfer, plaintiff spoke with Warden McKee about his loss-of-privileges sanctions. Plaintiff told McKee that Dr. Mutschler had made a recommendation to waive plaintiff's sanctions while he was housed at ICF, but that officials had refused to honor the request. Warden McKee responded that if Dr. Mutschler had made such a recommendation, his sanctions should have been lifted. Warden McKee promised to call Warden Stoddard, who was his former deputy warden. According to Plaintiff, nothing was done, and he was deprived of nine months of daily recreation during his time at IBC, resulting in the exacerbation of his physical and mental disabilities.

On October 31, 2014, Specialist Vette visited Plaintiff at Dr. Mutschler's request to investigate why plaintiff's sanctions had not been waived. Vette told plaintiff that Dr. Mutschler

wanted him removed from LOP, but that Ionia officials were not budging. Plaintiff asked Specialist Vette to notify Director Heyns and Warden McKee about Dr. Mutschler's recommendation. In addition, plaintiff sent letters and complaints to Director Heyns and Director of mental health Dawdy about his situation.

Plaintiff claims that defendants acted in violation of the Eighth Amendment and the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* ("ADA") by keeping him in his cell for more than 70 days without any exercise and by punishing him for his mental health condition. Plaintiff has alleged three counts. In Count I, plaintiff alleged that defendants subjected him to cruel and unusual punishment when they refused to provide him with prescribed treatment and denied him daily exercise and meaningful recreation. In Count II, plaintiff alleged that defendants subjected him to cruel and unusual punishment when they failed to provide him with exercise for 71 days. In Count III, plaintiff alleged that defendants denied him with services, programs and activities, and discriminated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* ("ADA"). For relief, plaintiff seeks compensatory and punitive damages and injunctive relief.

On initial screening, the Court dismissed Director Heyns and Mental Health Director Dawdy because plaintiff failed to allege that they engaged in any unconstitutional behavior. Opinion at PageID.79-80. The Court later granted RUM Gilkey's motion for summary judgment based on his limited involvement in responding to a grievance. *See* Order Adopting R&R (docket no. 58). However, the Court denied the motion for summary judgment filed by the other defendants and allowed plaintiff discovery limited to: obtaining the Memorandum of Dr. Mutschler and Moran in plaintiff's Threatening Behavior Hearing Packet from July 2013; plaintiff's "record file" and

"electronic record file" from July 2013; plaintiff's Offender Management Network Information ("OMNI") from June 1, 2013 through August 31, 2015; and a deposition by written questions directed to Dr. Mutschler. *Id.*; Order regarding discovery (docket no. 59).

## II. Defendants' motion for summary judgment

### A. Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

> **B.    Plaintiff's second and third motions to stay the summary judgment proceedings**

Once again, plaintiff is seeking to stay defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(d), which provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

In his second motion to stay proceedings, plaintiff stated that he was being moved from Macomb Correctional Facility to Marquette Branch Prison and asked to stay the proceedings until his property was delivered. Plaintiff provided neither a factual basis nor a brief to support this motion. Accordingly, the motion to stay (docket no. 76) should be denied.

Plaintiff's third motion sought to stay summary judgment because he was unable to obtain discovery from Dr. Mutschler. In this regard, plaintiff's claim is based upon defendants' alleged failure or refusal to follow Dr. Mutschler's instructions:

> I assert that in July 2013 Dr. Mutschler issued a Memorandum that waived my Loss of Privilege (LOP) sanctions, so that I can engage in daily exercise and recreation for reasons related to mental health, and that Defendants disregard[ed] Dr. Mutschler's recommendation.

Carter Decl. (docket no. 88, PageID.470).

Plaintiff also points out that the Court's order regarding discovery stated that plaintiff may request that a defendant or the MDOC "produce a copy of the memorandum created by Dr.

Mutschler and defendant Moran which appears in plaintiff's July 2013 threatening Behavior Hearing Packet, Record File and electronic Record File." *See* Order (docket no. 59, PageID.307). Plaintiff stated that defendants responded by providing him with a blank "Misconduct Sanction Assessment" created by defendant Moran, with an attached Memorandum regarding another MDOC prisoner named Hill. Carter Decl. at PageID.470. In support of his motion and affidavit, plaintiff attached a copy of the "Misconduct Sanction Assessment" signed by defendant Moran and dated July 15, 2013. *See* Misconduct Sanction Assessment (docket no. 87-1, PageID.464). The contents of this document appear to be entirely redacted. *Id*. Plaintiff also attached a copy of a memorandum from "C/O Santiago-Davis" regarding "Prisoner Hill" dated July 19, 2013. *Id*. at PageID.465. In his declaration, plaintiff wants to inspect Prisoner Hill's July 2013 Misconduct Hearing Packet, and speculates that defendants misfiled his (plaintiff's) materials. Plaintiff also wants to see his "Disciplinary Action Record Keeping Schedule" which he feels is necessary to demonstrate that he "was in fact denied exercise for more than 71-days." Carter Decl. at PageID.471. Defendants did not respond to plaintiff's motion to stay and provided no explanation for the apparent discrepancy in the records provided by defendants.

    Given the history of this case, the Court does not believe that defendants' second motion for summary judgment, which is their response to plaintiff's complaint, should be delayed further. Plaintiff has had an opportunity to perform the initial discovery ordered by the Court and this matter needs to proceed forward. Staying this matter will serve no useful purpose, given defendants' discovery responses and plaintiff's inability to locate Dr. Mutschler. Although plaintiff has not filed a response to the motion for summary judgment, plaintiff has made his arguments known in multiple filings, including his motions to stay, motions related to discovery and

declarations. For purposes of this report, the undersigned will construe plaintiff's third motion to stay, and previous relevant filings, to constitute his response to defendants' second motion for summary judgment. *See* Fed. R. Civ. P. 1 (federal court rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding").

### C. Defendants' motion

#### 1. Eighth Amendment claims

At the heart of plaintiff's Eighth Amendment claim is his allegation "that defendants were deliberately indifferent to his serious medical needs when they ignored Dr. Mutschler's recommendation to waive plaintiff's LOP sanctions because of his mental condition." *See* R&R (docket no. 56, PageID.291). Defendants' second motion for summary judgment is essentially a re-filing of their first motion. Defendants address both of plaintiff's Eighth Amendment claims stating that "[t]he medical records attached to Defendant Moran [sic] demonstrate that Plaintiff has received a considerable amount of treatment" and "there is insufficient evidence that Defendants were aware that Plaintiff's LOP [loss of privileges] sanction – imposed due to his misconducts – caused a substantial risk of serious harm to his mental health." Defendants' Brief (docket no. 73, PageID.370-371). Defendants, however, do not address the specific claim raised by plaintiff, i.e., that defendants were deliberately indifferent to his serious medical needs because they ignored Dr. Mutschler's recommendation to waive plaintiff's LOP sanctions due to his mental condition. Rather, defendants assert that the recommendations did nor exist or that they were unaware of the recommendations. Unit Chief Moran denies knowledge of Dr. Mutschler's request to waive the LOP. *See* Moran Aff. (docket no. 26-2, PageID.126) ("I don't have any recollection of a request by Dr. Mutschler to waive

Inmate Carter's LOP"). Warden Stoddard disputes whether the doctor made such a request. *See* Stoddard Aff. (docket no. 73-4, PageID.382) ("there is no documentation on file that indicates this recommendation was made by Dr. Kathleen Mutschler"). Finally, Specialist Vette denies plaintiff's allegation that Dr. Mutschler directed him to investigate why plaintiff was on LOP. *See* Vette Aff. (docket no. 73-5, PageID.396) ("William Vette denies he was directed by Director Mutschler to investigate why Carter was on LOP (Loss of privileges)") (emphasis omitted).

For his part, plaintiff filed a verified complaint, which has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). In his verified complaint, plaintiff points out that since 2005, MDOC officials have reported about 200 incidents in which plaintiff exposed himself to MDOC staff members. Compl. at PageID.6. Medical records reflect that plaintiff suffers from multiple sclerosis, and his chronic diagnoses include psychotic disorder NOS, mental disorder due to general medical condition, antisocial personality disorder and obsessive compulsive personality disorder (OCD). *See* Treatment Plan (docket no. 27, PageID.171). Plaintiff's medical condition and conduct have presented a challenge to MDOC officials, with medical providers both treating his conditions and noting that he has a history of using his multiple sclerosis symptoms for secondary gain. *See* Psych Med Review (docket no. 27, PageID.183); Behavioral Health Segregation Visit (July 22, 2013) ("It is unclear if prisoner is truly 'bugging out' or is manufacturing reports of symptoms in an attempt to manipulate to escape segregation"); Case Management Notes ("Prisoner continued to lament his current situation, claiming he is being punished for his mental illness (claims his masturbation misconducts are a symptom of OCD) . . . Prisoner is reminded that his tickets are not for being mentally ill, but for masturbating at female staff, and that he is responsible for his

choices in that regard.") (docket no. 27, PageID.199).  In this regard, plaintiff's records reflect that he receives multiple medications on a daily basis.  *See*, *e.g.*, Psych Med Review (July 12, 2013) (noting that "pt. beklieves [sic] perphenazine is not longer adequately effective to control visual hallucinations; agrees with a plan to initiate slow taper of risperdal while  observed and assessed for effectiveness . . .  Risperdal 0.5 mg going up to 2 mg HS (hallucinations), cogentin 0.5 mg BID (side effects), perphenazine 6 mg BID (tapering down).").

In his complaint, plaintiff stated that he has been subject to LOP since 2005, which deprives him of privileges such as:  day room; activity room; exercise facilities, such as yard, gym, weight pit; group meetings such as Bible Class and Jaycees; hobby craft activities; microwave; ice machine; general library; television; telephone; and use of kiosk (e.g. to send/receive electronic messages).  Compl. at PageID.7.  Plaintiff stated that he is confined to his cell twenty-four hours a day in the general population and that these harsh conditions "approach the limits of endurance." Compl. at PageID.7.  "Plaintiff is only allowed out of his cell for showers, and medical and mental health appointments." *Id*.  Plaintiff further stated that while he is "entombed in a concrete cell seven days a week . . .  he qualifies for seven-hours of limited recreation after serving thirty days of LOP," a regimen which the MDOC refers to as a "seven-day break." *Id*. at PageID.7-8.  According to plaintiff, he "must serve four consecutive weeks confined to his cell with no activities to engage in before he is allowed to attend one hour of yard for seven days." *Id*. at PageID.8.

Plaintiff points to MDOC Policy Directive 03.03.105 ¶ DDD, which states that:

> A prisoner with a mental disability is not responsible for misconduct if s/he lacks substantial capacity to know the wrongfulness of his/her conduct or is unable to conform his/her conduct to Department rules as a result of the mental disability. "Mental disability" is defined as any of the following:

> 1.  Mental illness, which is a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or the ability to cope with the ordinary demands of life.
>
> 2.  Severe chronic brain disorder, which is characterized by multiple cognitive defects (e.g., memory impairment resulting from a medical condition or brain injury due to trauma or toxins).
>
> 3.  Developmental disorder, which usually manifests before the age of 18 years and is characterized by severe and pervasive impairment in several areas of development (e.g., autism; retardation).

Based on plaintiff's allegations and treatment records, plaintiff has conditions which could meet the definition of mental disability under Policy Directive 03.03.105 ¶ DDD, i.e., mental illness (e.g., visual hallucinations treated by medication or psychotic disorder) or a severe chronic brain disorder (mental disorder due to general medical condition caused by MS).[1]

Plaintiff further stated that in July 2013, "Director of MDOC Mental Health Services, Dr. Kathleen Mutschler, instructed or proposed" that ICF Warden Stoddard and Unit Chief Moran waive plaintiff's LOP for mental health purposes, and that these defendants refused to do so contrary to ICF's own operating procedures. *Id*. at PageID.12-13. Plaintiff stated that on or about July 29, 2013, he spoke to Counselor Buchin during legal mail rounds, who stated to plaintiff that "that Lady over the Mental Health Program don't want you on sanctions any longer, she doesn't care what we think, I think you should be on LOP." *Id*. at PageID.13-14. When plaintiff asked what he was talking about, Buchin identified the "lady" as "the Mental Health Director," and told plaintiff "I will be printing you off a copy of the Memo waiving your sanctions and hopefully this will encourage

---

[1] This policy directive, coupled with plaintiff's diagnoses and medication, begs the question of plaintiff's mental status. Would a prisoner without mental illness repeat the same misconduct 200 times?

you to stay out of trouble." *Id*. at PageID.14.  Buchin never printed out a copy of the memo, stating that his printer was broken.  *Id*.

During a grievance interview on August 23, 2013, plaintiff asked RUM Gilkey about Dr. Mutschler's recommendation that plaintiff's sanctions be waived, and that Gilkey stated "it's on Stoddard's desk, she's aware of it" and "the officers don't like it."  Compl. at PageID.15.

During a grievance interview on August 29, 2013, plaintiff asked Unit Chief Moran about Dr. Mutschler's recommendation.  *Id*.  At that time, Unit Chief Moran "denied that Dr. Mutschler made the request and concealed information from plaintiff, despite the fact that he submitted a memorandum to ICF's hearing office in July 2013 to notify them of the Director's recommendation."  *Id*. at PageID.16.

During a meeting with Specialist Vette on or about October 31, 2013, Vette "notified Plaintiff that Mental Health Director Mutschler requested why Plaintiff's LOP sanctions had not been waived," and told plaintiff that "the Mental Health Director requested ICF officials to remove you from LOP, so that you can be in a more therapeutic envoirment [sic], but Ionia officials are not budgeting [sic]."  *Id*. at PageID.17.

With respect to the "seven day break," on or about July 29, 2013,  plaintiff notified Counselor Buchin that he had recently been released from segregation and had not received a seven-day LOP break since June 17, 2013 and that he needed to exercise.  *Id*.  Buchin stated that "I don't care when you received your last break, your [sic] not getting a [sic] exercise break until you serve thirty-one days of LOP from the date you was [sic] released from segregation."  *Id*.  On August 8, 2013, Buchin sent plaintiff a memorandum stating that plaintiff's seven-day sanction break was to

begin on August 27, 2013, which resulted in a LOP sanction break after 71 days, in violation of MDOC policy. *Id.*

Based on this record, genuine issues of material fact exist including whether Dr. Mutschler recommended or directed defendants to waive plaintiff's segregation, whether defendants followed any such recommendation, the contents of the memorandum from Unit Chief Moran, whether defendants denied plaintiff the so called "seven-day break," and whether plaintiff had one of the mental conditions listed in Policy Directive 03.03.105 ¶ DDD. Accordingly, defendants' motion for summary judgment should be denied with respect to the Eighth Amendment claims.

### 2. ADA claim

Defendants seek summary judgment on plaintiff's ADA claim because "[p]laintiff failed to establish that he was discriminated against *solely* because of his disability." Defendants' Brief at PageID.120 (emphasis in original). In addressing defendants' first motion for summary judgment, the Court advised defendants of a recent Sixth Circuit case which rejected the sole-causation requirement. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 357, fn. 1 (6th Cir. 2015) ("Our test for intentional discrimination under Title II of the ADA previously required that the discrimination be 'solely' because of the plaintiff's disability [citations omitted], but our decision in *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir.2012) (en banc), rejected this sole-causation requirement"). Defendants' second motion for summary judgment did not address the *Anderson* case. Nor have defendants addressed the application of the ADA to the facts alleged in this case. Accordingly, defendants' motion for summary judgment should be denied with respect to plaintiff's ADA claim.

13

### D. Qualified Immunity

Finally, defendants contend that they are entitled to summary judgment on the affirmative defense of qualified immunity. Under this affirmative defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The dispositive question is whether the violative nature of the particular conduct at issue in the lawsuit is clearly established. *See Mullenix v. Luna*, -- U.S. --, 136 S. Ct. 305, 308 (2015). "A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Carroll v. Carman*, -- U.S. --, 135 S. Ct. 348, 350 (2014). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Thus, the doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll*, 135 S. Ct. at 350.

When a defendant raises the issue of qualified immunity on summary judgment, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Although the plaintiff bears the ultimate burden, "[t]he defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Id.* Once this is accomplished, "the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct." *Id.* To meet

his burden on summary judgment, a plaintiff must show (1) that a constitutional right was violated, and (2) that the right was clearly established at the time of the violation. *Chappell v. City Of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). The court may exercise its discretion to decide which prong of the test to address first in light of the circumstances of the case. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir 2011), citing *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009).

Here, defendants held a wide variety of positions including Warden, Deputy Warden, Mental Health Rights Specialist, Mental Health Unit Chief and Counselor. While all of the defendants seek summary judgment on the basis of qualified immunity, they did not meet their initial burden by presenting facts to suggest that any particular defendant "acted within the scope of his [or her] discretionary authority during the incident in question." *Gardenhire*, 205 F.3d at 311. Rather, defendants state:

> Plaintiff has not supported his allegations with sufficient evidence. Even when the facts are viewed in a light most favorable to Plaintiff, the actions or inactions of Defendants were not objectively unreasonable. In sum, summary judgment should be granted in Defendants' favor because they are entitled to qualified immunity.

Defendants' Brief (docket no. 73, PageID.374). Even if defendants had met their initial burden, entry of summary judgment on the basis of qualified immunity is precluded by the factual disputes discussed in § II.C.1., *supra*. "[S]ummary judgment is not appropriate if there is a genuine factual dispute concerning whether the defendants committed acts that allegedly violated clearly established rights." *Margeson v. White County, Tennessee*, 579 Fed. Appx. 466, 470 (6th Cir. 2014).

### IV.    Recommendation

For the reasons set forth above, I respectfully recommend that plaintiff's motions to stay (docket nos. 76 and 86) be **DENIED**.

I further recommend that defendants' motion for summary judgment (docket no. 72) be **DENIED**.

I further recommend that the Court issue a case management order to prepare this matter for trial.


Dated:  March 13, 2017                /s/ Ray Kent
                                      RAY KENT
                                      United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).